RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE 8/1/13

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| CALVIN JAMES, <br>     Plaintiff | CIVIL ACTION <br> SECTION "P" <br> 1:10-CV-01706 |
| VERSUS | |
| CURTIS MASON, et al., <br>     Defendants | JUDGE JAMES T. TRIMBLE <br> MAGISTRATE JUDGE JAMES D. KIRK |

REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Before this court is a complaint filed pursuant to <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388, 91 S.Ct. 1999 (1971)[1] and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680, on November 2, 2010 and amended on January 19, 2011 (Doc. 4) by plaintiff Calvin James ("James"). The remaining defendants are Curtis Mason in his individual capacity ("Mason")(a correctional officer employed at the United States Penitentiary in Pollock, Louisiana ("USP-Pollock")) and the United States of America. James contends that, while he was incarcerated in USP-Pollock in 2010, Officer Mason intentionally

---

[1] <u>Bivens</u> defendants are federal officials brought into federal court for violating the Federal Constitution. <u>Bivens</u>-type actions may be brought only against federal agents and not federal agencies. <u>F.D.I.C. v. Meyer</u>, 510 U.S. 471, 486, 114 S.Ct. 996, 1006 (1994); <u>Whitley v. Hunt</u>, 158 F.3d 882 885 (5th Cir. 1998). Under <u>Bivens</u>, a plaintiff may recover damages for any injuries suffered as a result of federal agents' violations of his constitutional rights. <u>Channer v. Hall</u>, 112 F.3d 214, 216 (5th Cir. 1997).

activated a sliding steel gate to close on James, pinning him between the gate and the gate post. Calvin alleges that Mason did not open the gate until ordered to by Warden Keffer. James further alleges that the United States through the Bureau of Prisons has failed to implement policies or practices to prevent officers from closing the gates on inmates and failed to properly train the officers who man the gates, despite the fact that it has happened numerous times in the past. James alleges exhaustion of his administrative remedies for both causes of action (Docs. 1, 4).

Mason answered the complaint (Doc. 20) and filed a motion for summary judgment (Doc. 41). The United States did not answer the complaint, but filed a motion to dismiss alleging lack of subject matter jurisdiction (Doc. 41). The district court dismissed James' action in its entirety, finding in part that it lacked subject matter jurisdiction over the FTCA suit because the United States had not waived its sovereign immunity for this type of claim. James appealed the ruling.

After the district court decided James' case, the Supreme Court held, in Millbrook v. U.S., 133 U.S. 1441 (U.S. 2013), that "the waiver effected by the law enforcement proviso extends to acts or omissions of law enforcement officers that arise within the scope of their employment, regardless of whether the officers are engaged in investigative or law enforcement activity, or are executing a search, seizing evidence, or making an arrest."

Accordingly, the Fifth Circuit remanded the case for reconsideration of James' FTCA claim against the United States in light of the Supreme Court's holding in Millbrook, but affirmed the dismissal of James' Bivens action against Mason (Doc. 67). The United States is the sole remaining defendant in this case, and the only action left is James' FTCA claim.

On remand, the case was referred to the undersigned Magistrate Judge for Report and Recommendation. The United States filed a motion for summary judgment in the FTCA claim (Doc. 70), which James opposes (Doc. 73). That motion is now before the court for disposition.

## Law and Analysis

### Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure mandates that the court shall grant a summary judgment:

> "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Paragraph (e) of Rule 56 also provides the following:

> "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials-including the facts considered undisputed-show that the movant is entitled to it; or (4) issue any other appropriate order."

Local Rule 56.2W (formerly 2.10W) also provides that all

material facts set forth in a statement of undisputed facts submitted by the moving party will be deemed admitted for purposes of a motion for summary judgment unless the opposing party controverts those facts by filing a short and concise statement of material facts as to which that party contends there exists a genuine issue to be tried.

In this regard, the substantive law determines what facts are "material." A material fact issue exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. However, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to preclude summary judgment; there must be evidence on which the jury could reasonably find for the plaintiff. <u>Stewart v. Murphy</u>, 174 F.3d 530, 533 (5th Cir. 1999), 528 U.S. 906, 120 S.Ct. 249 (1999), and cases cited therein.

If the movant produces evidence tending to show that there is no genuine issue of material fact, the nonmovant must then direct the court's attention to evidence in the record sufficient to establish the existence of a genuine issue of material fact for trial. In this analysis, we review the facts and draw all inferences most favorable to the nonmovant. <u>Herrera v. Millsap</u>, 862 F.2d 1157, 1159 (5th Cir. 1989). However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for

summary judgment. Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir.), cert. den., 506 U.S. 825, 113 S.Ct. 82 (1992).

FTCA Claim

James contends the United States is liable for the acts of its BOP employee, Mason. The intentional tort exception to sovereign immunity, set forth in 28 U.S.C.A. § 2680(h), states:

> "[W]ith regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."

1. Liability Under Millbrook

The district court previously found the United States was not liable to James because Mason was not making an arrest or investigating something when James was injured, applying the "exception to the exception" to liability.[2] An exception to the

---

[2] The intentional tort exception to the waiver of sovereign immunity set forth in 28 U.S.C. § 2680(h) is limited by the "law enforcement proviso," which relinquishes sovereign immunity against claims arising out of torts enumerated in Section 2680(h) (including assault and battery) if the claim resulted from the act or omission of a federal investigative or law enforcement officer. See BOP employees are considered law enforcement officers for purposes of Section 2680(h) if they are acting within the scope of law enforcement functions (as opposed to security functions) at the time the tort is committed. Castro, 560 F.3d at 387. Therefore, had the prison guards in the case at bar been acting in a law enforcement capacity at the time that Weathington alleges they punched him, the law enforcement

exception was created by the lower courts. The intentional tort exception to the waiver of sovereign immunity set forth in 28 U.S.C. § 2680(h) was held to be limited by the "law enforcement proviso," which relinquishes sovereign immunity against claims arising out of torts enumerated in Section 2680(h) (including assault and battery) if the claim resulted from the act or omission of a federal *investigative or law enforcement* officer. See Devillier v. U.S., 2010 WL 476722, *3 (W.D.La. 2010), citing Castro v. U.S., 560 F.3d 381 (5th Cir. 2009), on reh'g, 608 F.3d 266 (5th Cir. 2010), cert. den., 131 S.Ct. 902 (U.S. 2011). See also, Sutton v. U.S., 819 F.2d 1289 (5th Cir. 1987)(historical background).

However, in Millbrook, 133 S.Ct. at 1443, the Supreme Court noted a conflict in the circuits and discussed the United States' liability for the intentional torts of law enforcement officers under the FTCA:

> "The FTCA 'was designed primarily to remove the sovereign immunity of the United States from suits in tort.' Levin v. United States, 568 U.S. ----, ----, 133 S.Ct. 1224, 1228, 185 L.Ed.2d 343 (2013) (internal quotation marks omitted). The Act gives federal district courts exclusive jurisdiction over claims against the United States for 'injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission' of a federal employee 'acting within the scope of his office or employment.' 28 U.S.C. § 1346(b)(1). This broad waiver of sovereign immunity is subject to a number of exceptions set forth in § 2680. One such exception, relating to intentional torts, preserves the Government's

---

exception to sovereign immunity would apply.

6

immunity from suit for '[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.' § 2680(h). We have referred to § 2680(h) as the 'intentional tort exception.' Levin, supra, at ----, 133 S.Ct., at 1227-1228 (internal quotation marks omitted).

"In 1974, Congress carved out an exception to § 2680(h)'s preservation of the United States' sovereign immunity for intentional torts by adding a proviso covering claims that arise out of the wrongful conduct of law enforcement officers. See Act of Mar. 16, 1974, Pub. L. 93-253, § 2, 88 Stat. 50. Known as the 'law enforcement proviso,' this provision extends the waiver of sovereign immunity to claims for six intentional torts, including assault and battery, that are based on the 'acts or omissions of investigative or law enforcement officers.' § 2680(h). The proviso defines ' "investigative or law enforcement officer"' to mean 'any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.' Ibid."

The Supreme Court found the narrowed exception against sovereign immunity for intentional torts by law enforcement officers was erroneous. The Supreme Court held that the waiver of sovereign immunity created by the law enforcement proviso extends to acts or omissions of law enforcement officers that arise within the scope of their employment, *regardless* of whether the officers are engaged in investigative or law enforcement activity, or are executing a search, seizing evidence, or making an arrest. Millbrook, 133 S.Ct. at 1446.

Therefore, the exception to the law enforcement proviso previously discussed in this case (Doc. 48) is no longer viable law. Pursuant to 28 U.S.C. § 2680(h) and Millbrook, the United

States is liable for the enumerated intentional torts[3] by federal law enforcement officers.

### 2. Law Enforcement Officer

Therefore, the next issue before the court is whether federal correctional officers, employed by the Bureau of Prisons, are "law enforcement officers" within the meaning of the intentional tort proviso to the FTCA.[4]

Bureau of Prisons employees are granted the power to make arrests on or off of Bureau of Prisons property, without a warrant, for specific federal offenses, including escape, assaulting an officer, contraband, and trespass, in 18 U.S.C. § 3050. Therefore, BOP employees clearly fit within the definition of Section 2680(h) as "law enforcement officers... of the United States who are empowered by law... to make arrests for violations of Federal law." See also, Chapa v. U.S. Dept of Justice, 339 F.3d 388 (5th Cir. 2003)(analogizing Section 2680(c) to Section 2680(h) and holding that Bureau of Prisons officials are law enforcement officers

---

[3] The enumerated intentional torts in the law enforcement proviso are assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution.  28 U.S.C. § 2680(h).

[4] The intentional tort proviso to the FTCA itself states that the FTCA's grant of jurisdiction to the federal courts for tort claims against the United States (hence the waiver of sovereign immunity) "shall apply to any claim" arising out of the enumerated torts committed by a governmental law enforcement or investigative officer. Sutton v. U.S., 819 F.2d 1289, 1295-1296 (5th Cir. 1987) (discussing the legislative history of the law enforcement proviso).

within the meaning of Section 2680(c) the FTCA), citing Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468 (1980)(implicitly finding that BOP employees are law enforcement officers within the meaning of 28 U.S.C. § 2680(h)). See also, Ali v. Federal Bureau of Prisons, 552 U.S. 214, 128 S.Ct. 831 (2008) (holding BOP employees are "law enforcement officers" within the meaning of Section 2680(c)).

Therefore, BOP Correctional Officer Mason is a law enforcement officer within the meaning of the Section 2680(h) of the FTCA, and the United States is liable if Mason committed a battery against James.

### 3. Intentional Tort

The court must now determine whether Mason committed an intentional tort, in this case a battery, against James.

In an FTCA case, the court must apply the law of the state in which the acts complained of occurred. Goodman v. U.S., 2 F.3d 291, 292-293 (8th Cir. 1993), citing 28 U.S.C. § 1346(b). Also, Naval Aviation Museum Found., Inc., 289 F.3d 715, 722 (11th Cir. 2002); Celestine v. U.S., 841 F.2d 851 (8th Cir. 1988)(government liability under the FTCA is determined by the law of the place where the tort occurred).

In Louisiana, the intentional tort of battery is a *harmful or offensive contact* with a person, resulting from an act *intended* to cause the plaintiff to suffer such a contact. Griffith v. Young, 46,184-C (La. App. 2d Cir. 4/13/11), 62 So.2d 856, 859, citing

Touchet v. Hampton, 2008-833 (La. App. 3d Cir. 12/11/08), 1 So.3d 729, writ den., 2009-0076 (La. 3/27/09), 5 So.3d 141. Also, Bazley v. Tortorich, 397 So.2d 475, 480 (La. 1981)(discussing the difference between an intentional tort and negligence). In a suit for damages resulting from an intentional tort, the claimant must carry the burden of proving all prima facie elements of the tort, including lack of consent to the invasive conduct. Touchet v. Hampton, 06-1120 (La. App. 3d Cir. 2008) 1 So.3d 718, 732, writ den., 2009-C-0076 (La. 3/27/09) 5 So.3d 141.

James alleges in his complaints that, when he tried to follow a prison employee through an automatic gate, Officer Mason (who was in the control tower) closed the gate on him and "impaled" him with the gate. James claims that Mason "assaulted" him with the gate. James alleges the United States is liable to him for failing to supervise and properly train Mason, and for failing to eliminate the known risk that the gate would close on people, as it has in the past.

Defendants contended in their previous motion to dismiss that the gate was opened for an employee, as alleged by James, but that James attempted to rush through the gate behind her as the gate was closing and was accidentally pinned in the gate. Defendants also contend that James' claim must fail because he did not sustain an injury; the gate immediately stopped closing when it came into contact with James.

Defendants show, in an affidavit from Correctional Officer Curt Mason (Doc. 41, Ex. 6), that Mason partially opened the gate for a staff member to pass through and, after she did, he immediately began to close the gate; while the gate was closing, James tried to squeeze through and was trapped in the gate for a moment (Doc. 41, Ex. 6). Mason further states in his affidavit that he did not intentionally close the gate on James and, when he saw James trapped, he opened the gate again and James walked through it (Doc. 41, Ex. 6). Mason states that inmates are not supposed to attempt to go through a gate unless it is in an "open movement," and that James had not been authorized to go through the gate while it was closing (Doc. 41, Ex. 6).

According to Mason's affidavit, the incident was accidental and not an intentional act by Mason. However James states in his "objections to defendant's statement of uncontested facts" (Doc. 73) that James, a staff member, and several other individuals were waiting at the gate at Tower 8 when the gate opened only half way, without any instruction given to the inmates by the tower (Officer Mason). James further states that, after staff member Tolbert went through the gate, he went "right after her," despite the lack of instruction from the Tower officer, and was caught in the gate when it closed (Doc. 73). James states that Officer Mason intentionally closed the gate on him (Doc. 73).

As previously discussed by the undersigned (Docs. 48, 67),

prison gates are customarily closed in order to prevent inmates from passing through them. Therefore, Mason's action in closing the automatic gate after the employee passed through was appropriate and not an act intended to commit a battery on James with the gate. James simply tried to pass through the gate while it was closing, without having been authorized to do so, as he admits, and the gate stopped when it came into contact with him, but James was momentarily trapped before Mason activated the gate to open again. Since closing the gate after the staff member passed through was appropriate, Mason's action in closing the gate was not intended to cause harm or be offensive to James. Therefore, Mason did not commit a battery on James by closing the gate.

    Nor did Mason commit a battery by not reopening the gate, since he did not intend to harm or be offensive to James, and James was not injured. Whether or not Mason started the gate opening again before or after Warden Keffer saw James and ordered Mason to open the gate again is irrelevant; James was caught in the gate only momentarily and, according to the defendant, the gate stopped automatically when it came into contact with James. Therefore, if Mason delayed opening the gate at all, he did not do so with the intent to cause James harm; James was not being harmed by the gate.

    Therefore, James has not carried his burden of proving that Mason committed the intentional tort of battery on him with the

12

gate.

### 4. Injury

Finally, James has not shown that he suffered an physical injury when the gate closed on him.

The United States submitted James' medical records to show that, on the date of the incident, **May 1, 2010**, after it occurred, James went to the infirmary and stated he did not have any pain, but just wanted to make a record of the incident (Doc. 41, Ex. 5, p. 4/41). On May 11, 2010, James reported to the infirmary that his "breast bone" was sore and tender to touch, and that it hurt when he inhaled deeply (Doc. 41, Ex. 5, pp. 6/41-7/41). An examination showed James' chest wall was non-tender on palpation, appeared normal without any swelling or bruising, and there was no evidence of internal complications (Doc. 41, Ex. 5, pp. 6/41-7/41). However, the infirmary gave James "MethylPREDNISolone" tablets and Acetaminophen for "contusion of chest wall" (Doc. 41, Ex. 5, p. 8/41). An x-ray of James' chest was ordered on June 8, 2010 (Doc. 41, Ex. 5, p. 7/41). On June 14, 2010, James complained that his "chest bone [wa]s popping" and he still could not take a deep breath, but he did not have marks on his chest or back, his lungs were clear, his heart was beating normally, he was unable to elicit the "popping" sound when examined, and his chest x-rays were negative (Doc. 41, Ex. 5, pp. 11-12/41). James was prescribed

Meloxicam[5] for "contusion of chest wall" (Doc. 41, Ex. 5, p. 12/41). Dr. Alexandre stated in his affidavit that there was no evidence of an injury in his medical evaluations and the x-ray (Doc. 41, Ex. 5, p. 3).

Also on June 14, 2010, James reported having paranoid feelings and anxiety, and requested a psychology consult (Doc. 41, Ex. 5, p. 13/41). On July 6, 2010, James reported that "he recently attempted to dart through the gate on the tower and got caught in the gate for a few seconds," but he was examined and cleared by medical and that was causing him some stress (Doc. 41, Ex. 5, p. 15/41). On July 8, 2010, it was noted that James did not have any pain, but had generalized anxiety (Doc. 41, Ex. 5, pp. 16-17/41).

On July 20, 2010 and August 13, 2010, James was again prescribed Meloxicam for "contusion of chest wall" (Doc. 41, Ex. 5, pp. 20/41, 24/41). On August 30, 2010, James was prescribed Capsaicin cream for "contusion of chest wall" (Doc. 41, Ex 5, p. 26/41). James again complained of pain on October 7, 2010, so he was referred to counseling and x-rays were ordered (Doc. 41, Ex. 5, pp. 28-30/41). Dr. Alexandre examined James on October 20, 2010, found "some discomfort at chondro sternal articulations in the

---

[5] Meloxicam is an anti-inflammatory used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. See MEDLINEplus Drug Information: Meloxicam, *available at* http://www.nlm.nih.gov/medlineplus/druginformation.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

manubrial area," but noted there was no pain on palpation of costochondral junction at 2nd and 3rd rib level (Doc. 41, Ex. 5, p. 35/41). From the x-rays of James' ribs, Dr. Alexandre diagnosed temporary, acute "sprain and strain of ribs," explained the pain was likely a "boney pain" that would eventually go away, and discontinued James' medications (Doc. 41, Ex. 5, pp. 34-35/41).

Dr. Joel Alexandre stated in his affidavit (Doc. 41, Ex. 5, p. 1/41) that there was no objective evidence that James suffered a physical injury from the gate, but he had been prescribed medications anyway for his discomfort (Doc. 41, Ex. 5, pp. 2-3).

It is apparent James was not injured when he was closed in the gate. The alleged popping sounds and difficulty breathing he had in mid-June, and alleged pain he had in July, were unproven by any objective medical evidence. James' chest wall contusion in August and "rib strain" in October are not shown to have been caused by his having been caught in the gate on May 1, 2010. Therefore, James has not carried his burden of proving he suffered a physical injury when the gate closed on him.

James also complains that he suffered generalized anxiety from the incident on May 1, 2010. However, James is not entitled to recover damages for a mental injury without first proving he suffered a physical injury. Pursuant to 28 U.S.C. § 1346(b)(2), no person convicted of a felony who is incarcerated while serving a sentence may bring a civil action against the United States or an

15

agency, officer, or employee of the Government, for mental or emotional injury suffered while in custody without a prior showing of physical injury. Since James did not prove that he suffered a physical injury, he cannot recover damages for a mental injury.

Accordingly, James has not carried his burden of proving Mason committed a battery on him for which the United States would be liable under the FTCA. Since there are no genuine issues of material fact which would preclude a summary judgment in favor of the United States, the United States' motion for summary judgment should be granted.

### 5. Other Claims

James also raises claims that the United States through the Bureau of Prisons failed to properly supervise and train Mason. Since the United States has sovereign immunity against such claims, they should be dismissed.

### Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that the United States' motion for summary judgment be GRANTED and that James' action against the United States be DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another

16

party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 1st day of August 2013.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE